RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0117p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

LIVINGSTON CHRISTIAN SCHOOLS,

*Plaintiff-Appellant,*

*v.*

GENOA CHARTER TOWNSHIP,

*Defendant-Appellee.*

┐
│
│
│
│  No. 16-2060
│
│
│
┘

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:15-cv-12793—George C. Steeh, District Judge.

Argued: April 26, 2017

Decided and Filed: June 2, 2017

Before: MERRITT, GILMAN, and DONALD, Circuit Judges.

───────────────

**COUNSEL**

───────────────

**ARGUED:** Robert K. Kelner, COVINGTON & BURLING, LLP, Washington, D.C., for Appellant. T. Joseph Seward, SEWARD PECK & HENDERSON, Royal Oak, Michigan, for Appellee. **ON BRIEF:** Robert K. Kelner, COVINGTON & BURLING, LLP, Washington, D.C., Hiram S. Sasser III, Stephanie N. Taub, FIRST LIBERTY INSTITUTE, Plano, Texas, for Appellant. T. Joseph Seward, Lindsey A. Peck, SEWARD PECK & HENDERSON, Royal Oak, Michigan, Carol A. Rosati, Anne McClorey McLaughlin, JOHNSON ROSATI SCHULTZ & JOPPICH, Farmington Hills, Michigan, for Appellee.

───────────────

**OPINION**

───────────────

RONALD LEE GILMAN, Circuit Judge. Livingston Christian Schools (LCS) is a private, nondenominational Christian school with a mission of providing a religiously oriented

education to students in Livingston County, Michigan.  After operating for several years in the town of Pinckney, LCS sought to relocate.  LCS entered into a lease agreement with Brighton Nazarene Church (the Church), located in Genoa Charter Township (the Township), so that LCS could operate its school on the Church's property.  Shortly thereafter, the Township informed LCS that an amended special-use permit would be required before the Church property could be used for the school.  The Church then applied for such a permit (hereinafter referred to as the "special-use permit") on LSC's behalf.  In a four-to-three vote, the Township Board denied the application.

The Board's action prompted LCS to file a complaint against the Township in the United States District Court for the Eastern District of Michigan.  LCS alleged that the denial of the application for a special-use permit violated the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq*.  The Township moved for summary judgment in its favor, which the district court granted.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

**A.      Factual background**

### 1.  *LCS's attempt to relocate its operations to the Church*

LCS describes its mission as providing a Christian education "for the Livingston County Community."  From 2006 to 2015, LCS carried out this mission at a building in Pinckney (the Pinckney property).  Pinckney is located in the southernmost portion of Livingston County, which is outside of the Township.

A declaration by LCS's treasurer, Scott Panning, notes that Pinckney is "without easy access to the interstate or major commuter roads," that the Pinckney area is less populated than the central area of Livingston County, and that Pinckney's population is declining.  In addition, Panning explained that the building on the Pinckney property needed extensive, costly maintenance.

LCS asserts that these problems have led to financial difficulties. At a meeting in November 2012, the LCS Board decided that remaining at the Pinckney property on a long-term basis "will end in the dissolution of the school due to lack of enrollment and income." So LCS resolved to search for another location. LCS wanted to relocate to either "the Brighton or Howell area," both of which are within Livingston County. There are both cities and townships by the names of Brighton and Howell; LCS did not specify whether the "area" that it had in mind refers to the city, the township, or both. *See Municipalities*, Livingston County, Michigan, https://www.livgov.com/Pages/Municipalities.aspx (last visited May 31, 2017). Several options within these areas were explored, but LCS asserts that only the Church property was suitable.

LCS then entered into an agreement to lease the Church's building for use as a school. According to Panning, LCS was unaware when signing the lease agreement that the Church would need to amend its special-use permit to allow LCS to so operate. After entering into the lease agreement, LCS prepaid the Church $70,000 in rent and began advertising its new location to prospective students.

The Township eventually heard about LCS's plans to operate at the Church and informed the Church that the existing special-use permit would have to be amended in order for LCS to use the Church's building as a school. In March 2015, the Church applied for the permit. Two public hearings were held, where several neighbors of the Church expressed concerns about the application. The primary complaints were that (1) LCS's operations would worsen already heavy traffic, and (2) the Church had a history of failing to comply with its previous special-use permits by using its property in ways that neighboring residents found disruptive.

After the second meeting, the Township's Planning Commission reviewed the application and a traffic study submitted by the Church. The Planning Commission then recommended that the Township Board approve the Church's application with several conditions attached.

Despite the Planning Commission's recommendation, the Township Board voted to deny the special-use permit in a four-to-three decision at the July 2015 Board meeting. The July meeting minutes did not explain the reasons for the denial, but the August 3, 2015 meeting minutes did. These reasons included traffic concerns, inconsistency with the single-family

residential zoning of the surrounding area, the failure of the Planning Commission's proposed conditional approval to mitigate these problems, and the Church's history of noncompliance with the zoning ordinance and with the conditions on the Church's prior special-use permits.

### 2. *LCS's use of other properties*

After the denial of the special-use permit, LCS entered into a short-term lease with the Whitmore Lake School District in August 2015, which allowed LCS to use the District's former public middle-school building located in neighboring Washtenaw County for LCS's school. Counsel for LCS explained at oral argument that LCS is currently using the Whitmore Lake property under what is essentially a year-to-year lease. But the Whitmore Lake School District has informed LCS that the School District might reoccupy the school building at some point in the future. LCS asserts that the Whitmore Lake property is therefore not a viable long-term option for its school. According to LCS, the Whitmore Lake property is also inadequate for several additional reasons. One is that the property is inconveniently located for LCS's students. The conditions of the lease, moreover, inhibit LCS's efforts to recruit prospective students, to effectively run sports programs, to keep the property secure, and to serve lunch to its students.

In addition to leasing the Whitmore Lake property, LCS is the owner of the Pinckney property from which it sought to relocate in 2015. Even though LCS owns the Pinckney property, it decided not to continue its operations there when the special-use permit for the Church property was denied. LCS has instead leased the Pinckney property to the Light of the World Academy (LOTWA), a publicly funded charter school, for a term of seven years. The lease was executed on August 20, 2015, after the Township officially denied the Church's application for a special-use permit on August 3, 2015 and after LCS filed its original complaint on August 7, 2015.

### B.    Procedural background

In its original complaint, LCS alleged that the Township's denial of the special-use permit violated RLUIPA's substantial-burden provision, 42 U.S.C. § 2000cc(a)(1). LCS later amended its complaint to add alleged violations of the First and Fourteenth Amendments. But

neither of these constitutional claims are before us on appeal because LCS has not raised these issues in its brief.

LCS filed an emergency motion for a temporary restraining order and a preliminary injunction, which the district court denied. The Township then moved for summary judgment. LCS did not file a cross-motion for summary judgment but, in its response to the Township's motion, LCS informally asked the district court to grant summary judgment in its favor pursuant to Rule 56(f)(1) of the Federal Rules of Civil Procedure. Rule 56(f)(1) allows the district court to grant summary judgment in favor of a nonmoving party "[a]fter giving notice and a reasonable time to respond."

The district court did not act on LCS's request. It instead granted summary judgment in favor of the Township, concluding that the Township's denial of the application did not impose a substantial burden on LCS because LCS had both the Pinckney and Whitmore Lake properties as adequate alternatives to the Church property. Noting that the parties made essentially the same arguments in the summary-judgment proceedings as in the emergency-motion proceedings, the court "incorporate[d] by reference" its ruling denying LCS's motion for a temporary restraining order and a preliminary injunction.

## II. ANALYSIS

### A.      Standard of review

We review de novo the district court's grant of summary judgment. *Williams v. AT&T Mobility Servs.*, 847 F.3d 384, 391 (6th Cir. 2017). Summary judgment is proper when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "We must view all evidence in the light most favorable to the nonmoving party in making this determination." *Williams*, 847 F.3d at 391.

As for the substantial-burden inquiry, the ultimate decision on whether the Township's actions imposed a substantial burden on LCS under RLUIPA is a question of law for us to

decide.  *See Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 93 (1st Cir. 2013) (explaining that the existence of a substantial burden is a question of law because "the corollary question of whether the government's interest is compelling is generally treated as a question of law," and because of the importance of appellate courts conducting de novo reviews of the legal aspects of First Amendment claims, which are "corollaries" of RLUIPA claims).  *But see World Outreach Conference Ctr. v. City of Chicago*, 591 F.3d 531, 539 (7th Cir. 2009) (assuming with little reasoning that the substantial-burden inquiry is a factual question, and noting that no other court at that point in time had specified whether this was a question of law or of fact).

**B.      LCS's leasehold interest is protected under RLUIPA.**

RLUIPA explicitly protects "leasehold" interests in property.  *See* 42 U.S.C. § 2000cc-5(5).  "Leasehold" and "ownership" interests are listed in the same provision and are therefore presumably entitled to the same level of protection.  LCS clearly possessed a leasehold interest in the Church property by way of the lease agreement.  The Township does not dispute that LCS had such an interest.  Rather, the Township argues that the district court correctly concluded that the denial of the special-use permit did not violate RLUIPA because the denial did not effectively bar all religious exercise on the Church's property.

But the religious institution at issue here is LCS, not the Church, and the land interest at issue is LCS's leasehold interest, not the Church's ownership interest.  In addition, LCS persuasively argues that taking into account the Church's ability to use the property for its own purposes as a factor against LCS's RLUIPA claim would result in treating LCS differently from a religious institution that leased property from a secular landlord.  We will therefore consider only LCS's ability to exercise *its* religious mission (and not the Church's) in evaluating whether there was a substantial burden on LCS.

**C.     The test for whether a substantial burden exists**

RLUIPA does not define the term "substantial burden."  Its only reference to the term is contained in the following provision:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that the imposition of the burden . . . (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc.  Nor has the Supreme Court had occasion to focus on the substantial-burden inquiry under RLUIPA in the land-use context, although it has done so in the institutionalized-persons context.  *See Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015) (holding that a prison's policy forbidding a prisoner to grow a beard of a certain length, which the prisoner sincerely believed was required by his religion, substantially burdened the prisoner even though the prison permitted him to engage in other religious practices, such as following a specified diet and keeping a prayer rug in his cell).  Even in *Holt*, the Supreme Court did not articulate a definition of "substantial burden," but rather explained that the ability to engage in other religious practices did not prevent a prisoner from making a substantial-burden claim as to the rule against growing a half-inch beard.  We will therefore turn to caselaw from this court and other circuits regarding the substantial-burden inquiry.

### 1. Sixth Circuit cases

There are only two cases in this circuit, both of which are unpublished, that address the question of whether a land-use regulation imposed a substantial burden under RLUIPA.  The first is *DiLaura v. Township of Ann Arbor*, 112 F. App'x 445 (6th Cir. 2004), where this court affirmed the district court's conclusion that a substantial burden existed based on a zoning ordinance that required the plaintiffs, who wanted to establish an overnight religious retreat, to operate as a bed-and-breakfast establishment.  *Id.* at 446.  In *DiLaura*, the court noted that restrictions on such establishments prevented the plaintiffs from serving Communion wine and meals other than breakfast.  The plaintiffs would also have been required to charge their guests a fee for lodging.  Because the plaintiffs' plan was to operate a prayer retreat that would provide

free lodging, and to serve lunch, dinner, and Communion wine, the court found that the plaintiffs would be "effectively barred . . . from using the property in the exercise of their religion" if their property were designated as a bed and breakfast. *Id.* The court did not provide any other explanation for its holding or articulate a test for whether a substantial burden existed.

The other Sixth Circuit case is *Living Water Church of God v. Charter Township of Meridian*, 258 F. App'x 729 (6th Cir. 2007), where this court reversed the district court's conclusion that a substantial burden existed. 258 F. App'x at 742. In *Living Water*, the plaintiff was a church that wanted to construct an additional building on its property for use both as a religious school and as extra space for the church. *Id.* at 731. A special-use permit that was needed for the building was granted insofar as it allowed a school on the residentially zoned property. *Id.* at 732. But the permit restricted the church to a total of 25,000 square feet of floor space amongst all of its buildings, thwarting the church's efforts to construct a single building of almost 35,000 square feet. *Id.* at 731–32.

The court in *Living Water* explicitly "decline[d] to set a bright line test" to determine whether a substantial burden exists, but announced "a framework to apply to the facts before us." *Id.* at 737. That framework asks: "[D]oes the government action place substantial pressure on a religious institution to violate its religious beliefs or effectively bar a religious institution from using its property in the exercise of its religion?" *Id.* The court also stated that a land-use regulation "may make religious exercise more expensive or difficult" without necessarily imposing a substantial burden. *Id.* Applying this framework, the court concluded that the church had not been substantially burdened because the church remained free to construct a school building. *Id.* at 738–39. The court concluded that there was no evidence in the record that a new building of the permitted size would be so inadequate as to constitute a substantial burden. *Id.* at 739. Although the court acknowledged testimony that the church would be burdened by incurring additional expenses to develop plans for a smaller building, and by not having space for a gymnasium, the court concluded that these were "mere inconvenience[s]." *Id.*

In a concurring opinion, Judge Moore cautioned that *Living Water*'s framework was "inadvisable" because the effective-bar prong was "so broad as to swallow the substantial-burden inquiry." *Id.* at 742 (Moore, J., concurring). We agree. The language of the effective-bar prong

would mean that, any time that a land-use regulation completely barred the religious use of a property, a substantial burden would automatically exist. *See, e.g., Andon, LLC v. City of Newport News*, 813 F.3d 510, 516 (4th Cir. 2016) (explaining that any framework that would essentially create an "automatic exemption" from land-use regulations for religious plaintiffs would contravene RLUIPA's intent).

Moreover, the effective-bar prong of *Living Water* fails to take into account circumstances that other circuits have considered in the substantial-burden inquiry, such as whether a religious institution has ready alternatives to carry out its mission, or whether the religious institution's inability to use available land was self-imposed. *See* Part II.C.3. below. Judge Moore also noted that no other circuit had adopted the effective-bar language. *Living Water*, 258 F. App'x at 742 (Moore, J., concurring). Nor are we aware of any other circuit that has done so since *Living Water* was decided.

Finally, the court in *Living Water* was apparently trying to avoid creating a precedent, specifically crafting "a framework to apply to the facts before us." 258 F. App'x at 737. The factual context in the present case is materially different from that in *Living Water*. We therefore decline to follow the *Living Water* framework and will instead focus directly on RLUIPA's test of whether the "land-use regulation . . . imposes a substantial burden on the religious exercise of [the] institution." 42 U.S.C. § 2000cc.

### 2. The meaning of "substantial burden" under RLUIPA

One principle that clearly emerges from both *Living Water* and our sister circuits' decisions is that not just any imposition on religious exercise will constitute a violation of RLUIPA. Instead, a burden must have some degree of severity to be considered "substantial." *See, e.g., Int'l Church of the Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1067 (9th Cir. 2011) (explaining that a substantial burden "must impose a significantly great restriction or onus upon [religious] exercise" (quoting *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004))); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004) (concluding that a substantial burden is "more than an inconvenience"). As this court recognized in *Living Water*, taking seriously the requirement that

a burden be "substantial" is necessary in order to avoid an interpretation of RLUIPA that would exempt religious institutions from all land-use regulations. 258 F. App'x at 729, 736 ("If the term 'substantial burden' is not to be read out of the statute, RLUIPA cannot stand for the proposition that a construction plan is immune from a town's zoning ordinance simply because the institution undertaking the construction pursues a religious mission.").

Other circuits have persuasively explained that land-use regulations do not typically compel plaintiffs to "violate their beliefs" in the way that, for example, prison rules might require an inmate to engage in conduct that goes against his or her religious tenets. *See, e.g.*, *Bethel World Outreach Ministries v. Montgomery Cty. Council*, 706 F.3d 548, 555–57 (4th Cir. 2013) (explaining that the government does not have "absolute control" over religious institutions in the land-use context in the same way that a prison has control over inmates, so that land-use decisions will "rarely" force a religious institution to violate its beliefs). But land-use regulations can prohibit a plaintiff from engaging in desired religious behaviors, causing some courts to define a substantial burden as something that places significant pressure on an institutional plaintiff to modify its behavior. *See id.* at 555.

### 3. *Several factors from our sister circuits' caselaw are helpful in determining whether LCS was substantially burdened by the Township's action.*

Our sister circuits have identified several factors that are helpful in determining whether a land-use regulation has imposed a substantial burden on a religious institution. One factor, which the district court properly considered here, is whether the religious institution has a feasible alternative location from which it can carry on its mission. *See Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 352 (2d Cir. 2007). Whether the religious institution will suffer "substantial 'delay, uncertainty, and expense'" due to the imposition of the regulation is another factor. *Id.* at 349 (quoting *Saints Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 901 (7th Cir. 2005).

The plaintiff's own actions have also been found relevant in determining whether a burden is considered substantial. Several circuits have held that, when a plaintiff has imposed a burden upon itself, the government cannot be liable for a RLUIPA substantial-burden violation. For example, when an institutional plaintiff has obtained an interest in land without a reasonable

expectation of being able to use that land for religious purposes, the hardship that it suffered when the land-use regulations were enforced against it has been deemed an insubstantial burden. *See, e.g.*, *Andon*, 813 F.3d at 515 (concluding that a burden was not substantial because it was self-imposed when the plaintiff entered into a contingent lease agreement for a property despite knowing that the property failed to meet applicable setback requirements and having been informed that the application for a zoning variance would be denied); *Petra Presbyterian Church v. Vill. of Northbrook*, 489 F.3d 846, 851 (7th Cir. 2007) (concluding that the plaintiff was not substantially burdened when it had imposed the burden upon itself by purchasing property in an industrial zone for use as a church after having been informed that its special-use application would be denied because the relevant zoning ordinance banned churches in that zone).

Whether LCS had a feasible alternative location, whether LCS faced substantial delay, uncertainty, and expense, and whether LCS's burden was self-imposed are helpful factors for us to consider in determining whether the Township's action placed a substantial burden on LCS in this case. We therefore discuss in Part III.D. below how these factors apply to the case before us.

As a final matter to consider, we note one often-cited factor: whether there is evidence that the municipality's decisionmaking process was arbitrary, capricious, or discriminatory. *See, e.g.*, *Westchester*, 504 F.3d at 350–51; *Guru Nanak Sikh Soc'y v. Cty. of Sutter*, 456 F.3d 978, 989–91 (9th Cir. 2006); *Saints Constantine*, 396 F.3d at 900–01. We deem this factor irrelevant in the present case because LCS has not argued that it faced a substantial burden as a result of any discriminatory decisionmaking by the Township. LCS instead alleges that the Township's decision was discriminatory only with regard to the Township's purported lack of a compelling interest for denying the special-use permit application.

In any event, although several other circuits have taken evidence of alleged discrimination into account in considering whether there was a substantial burden on religious exercise, we decline to adopt this approach. Evidence of improper decisionmaking is more appropriately considered when evaluating whether a governmental action was narrowly tailored to serve a compelling state interest—an inquiry that the court should undertake only after finding that a substantial burden exists. *See Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 741 (6th Cir. 2007) (declining to consider evidence of arbitrary

decisionmaking by the municipality where the church had failed to first show that a substantial burden existed, noting that proof of the municipality's motive is not relevant to the substantial-burden inquiry).

RLUIPA, moreover, contains a separate prohibition on discrimination in the implementation of land-use regulations, which does not require that the regulation impose a substantial burden. *See* 42 U.S.C. § 2000cc(b)(1)–(2) (prohibiting governmental entities from "impos[ing] or implement[ing] a land use regulation in a manner that" either "treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution" or "discriminates against any assembly or institution on the basis of religion or religious denomination"). Finding a substantial burden due to evidence of discrimination would obviate the need for § 2000cc(b)(1)–(2). *See Bethel World Outreach Ministries*, 706 F.3d at 557 (concluding that requiring proof of religious discrimination in order to make out a substantial-burden claim "would render the nondiscrimination provision superfluous").

**D.     The district court's grant of summary judgment to the Township was proper because, as a matter of law, LCS failed to put forth sufficient evidence to establish that the Pinckney property was an inadequate location for its religious mission.**

LCS argues that the district court erred in granting summary judgment to the Township on the basis that the Pinckney and Whitmore Lake properties were "ready alternatives" for LCS. Several of our sister circuits have addressed the issue of when the availability of other properties defeats a substantial-burden claim. Where plaintiffs have had access to other properties close to the property affected by the challenged land-use regulation, the courts have generally found that no substantial burden exists. *See World Outreach Conference Ctr. v. City of Chicago*, 591 F.3d 531, 539 (7th Cir. 2009) (concluding that there was no substantial burden when the plaintiff was denied permission to demolish a historic building on its property and construct a new building, given that the plaintiff owned other empty space on its campus where it could construct the building); *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 100 F. App'x 70, 73, 77 (3d Cir. 2004) (concluding that the plaintiff had not demonstrated a likelihood of success on a substantial-burden claim when the plaintiff was denied a variance for property that it had purchased, reasoning that the plaintiff was able to fully operate at a rented location just across the street from the property at issue); *see also Midrash Sephardi, Inc. v. Town of Surfside*,

366 F.3d 1214, 1227–28 (11th Cir. 2004) (concluding that walking a few additional blocks was not a substantial burden where the zoning ordinance required the plaintiff, an Orthodox Jewish synagogue whose members' beliefs forbade them from using motorized vehicles on the Sabbath, to be located a few blocks away from its desired location).

On the other hand, RLUIPA plaintiffs have survived a motion for summary judgment where they have raised a genuine dispute as to whether their current location was adequate for their religious mission. *See, e.g.*, *Bethel World Outreach Ministries*, 706 F.3d at 558 (holding that the plaintiff church had put forth sufficient evidence to survive summary judgment where the already-existing facilities were so overcrowded that the church had to hold four services each Sunday, to shorten each one, to change its Communion and "Altar Call" practices, and to turn people away); *Int'l Church of the Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1068–69 (9th Cir. 2011) (holding that the plaintiff church had demonstrated that its current facility was inadequate because the church's "core beliefs" required it to assemble in one worship service, yet it had to hold three Sunday services in its existing facility); *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 352 (2d Cir. 2007) (holding that there was a substantial burden on the plaintiff school, in part because the school had demonstrated that it was expanding and that its existing buildings did not have sufficient space).

In each of the cases ruling in the plaintiffs' favor, the plaintiffs had demonstrated that they were unable to carry out some core function of their religious activities due to the inadequacy of their current facilities. The school in *Westchester Day School*, for example, presented evidence from architects and other experts that existing buildings did not have enough space to incorporate planned expansions for new classrooms, labs, art and music rooms, and other facilities, all of which would be used for educational purposes that integrated religious teachings. 504 F.3d at 346, 352. In *Bethel*, the church likewise put forth evidence that Communion and Altar Call practices had to be modified, and that worshippers had to be turned away, due to the fact that the services were overcrowded. 706 F.3d at 558. The church in *Foursquare* also demonstrated that its current facilities did not provide sufficient space for the congregation to worship in one service, preventing the unity of worship that was central to its beliefs. 673 F.3d at 1069. When such central religious beliefs are in question, courts must be

especially deferential to testimony from the religious institution about the truth of that belief. *Id.* (explaining that the plaintiff had clearly alleged that its "core beliefs" were at stake, and that the Supreme Court has cautioned that "while a court can arbiter the sincerity of an individual's religious beliefs, courts should not inquire into the truth or falsity of stated religious beliefs").

Unlike the plaintiffs in the aforementioned cases, LCS put forth only conclusory evidence that the Pinckney property is inadequate, and LCS did not allege that any of its core religious functions cannot be carried out at Pinckney. LCS submitted declarations from its principal and its treasurer as evidence of dwindling enrollment. These declarations state that "the fulfillment of [LCS's] religious mission of operating a Christian school to serve the entire Livingston County community necessitated a move from the Pinckney Property . . . to a facility more centrally located in Livingston County"; that LCS's enrollment increased due to the anticipated move to the Church and decreased upon denial of the permit; that the Pinckney property is "without easy access to the interstate or major commuter roads," making attracting students difficult; that Pinckney is "much less populated than the central area of Livingston County"; that Pinckney's population has recently declined; that the Pinckney property "required extensive maintenance and was in need of expensive repairs"; and that the Church was a superior alternative to the Pinckney property because LCS would be able to attract families affiliated with the Church.

LCS also submitted its Board's meeting minutes stating the Board's fear that remaining at the Pinckney property would eventually cause LCS to go out of business. In addition, LCS argues that the Pinckney property is inadequate because LOTWA had to switch its model from being a private religious school to being a publicly funded charter school in order to operate there. Excerpts of a deposition of LOTWA's president, Laura Burwell, are offered in support of this claim.

Although the above evidence provides a modicum of support for the proposition that the Pinckney property's location is inadequate, it is not sufficient to meet LCS's burden of surviving the Township's motion for summary judgment. The meeting minutes and other statements fearing that LCS will eventually be forced to close are little more than speculation because they are not substantiated by facts in the record. *See Alexander v. CareSource*, 576 F.3d 551, 560

(6th Cir. 2009) ("Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment."). As this court stated in *Living Water*, whether a substantial burden exists must be evaluated at the present moment, not based on speculation about whether such a burden might arise in the future. *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 738 (6th Cir. 2007).

When faced with the burden of producing sufficient evidence to demonstrate that a genuine dispute of material fact existed, LCS had the obligation to provide evidence to substantiate its claims. LCS conceded at oral argument that it failed to provide its financial records to document the extent of its present loss of funds. Likewise, LCS acknowledged that it had not provided enrollment statistics to demonstrate the alleged drop in student enrollment that prompted LCS to relocate. The declarations provided by LCS did establish that 139 students were enrolled during LCS's last year at Pinckney, that 59 new students had enrolled after the announcement of LCS's move to the Church, and that 18 new students and 15 returning students unenrolled after the special-use permit was denied. But the declarations provide no historical enrollment data to indicate how LCS performed before its last year at Pinckney.

Moreover, LCS failed to produce evidence that would be admissible at trial about *why* the alleged drop in enrollment occurred. To make out a substantial-burden claim under RLUIPA, LCS must demonstrate that the land-use regulation implemented by the Township—the denial of the Church's special-use permit application—imposed a substantial burden on LCS. *See* 42 U.S.C. § 2000cc. LCS cannot prevail if the burden of declining enrollment was caused by something other than its inability to relocate to the Church. *See Andon, LLC v. City of Newport News*, 813 F.3d 510, 515 (4th Cir. 2016) (explaining that burdens are not substantial if they are self-imposed).

Although LCS could have introduced evidence regarding the reasons for its drop in enrollment by providing declarations or depositions from the families of students who unenrolled after the Church's special-use permit was denied, LCS did not do so. Panning's declaration states that Pinckney's remote location was the reason for the declining enrollment. But this explanation of the students' alleged reasons for unenrolling is based on hearsay. The statement would therefore be inadmissible at trial if offered to prove that the actual cause of the declining

enrollment was Pinckney's remote location.  *See* Fed. R. Civ. P. 56(c) (providing that an affidavit or declaration may be used as evidence at the summary-judgment stage only if it is "made on personal knowledge" and "set[s] out facts that would be admissible in evidence"); *Alpert v. United States*, 481 F.3d 404, 408–09 (6th Cir. 2007) (explaining that statements in an affidavit that amounted to hearsay cannot be considered at the summary-judgment stage).

Similarly, the evidence about LOTWA's decision to become a publicly funded charter school instead of remaining a religious school is insufficient because it does not explain the reason for *LCS*'s financial difficulties.  Even the testimony of LOTWA's president Burwell, on which LCS heavily relies for its argument that the Pinckney property is unsuitable, indicates that LOTWA's experience cannot be compared to LCS's.  Burwell stated in her deposition that LOTWA became a charter school because it was "having a difficult time keeping our enrollment numbers up at a tuition-based school" after relocating to Pinckney.  When asked whether she knew why the Pinckney property did not fit LCS's needs, however, Burwell stated that "I don't know if Livingston Christian had the same experience."  The record contains only five nonconsecutive pages of Burwell's deposition and provides no other context about LOTWA's finances, enrollment statistics, or student demographics that might allow for a persuasive comparison of LOTWA to LCS.

And even if we were to assume that LCS's characterization of Pinckney as a remote, inaccessible area is supported by record evidence that would be admissible at trial, we conclude as a matter of law that remaining at the Pinckney property would not have imposed a substantial burden on LCS.  The Pinckney property, located at 550 E. Hamburg St., Pinckney, Michigan, is a 12.1-mile drive from the Church, located at 7669 Brighton Road, Brighton, Michigan.  *See* maps.google.com.  Because LCS insists that the Church would have been a more convenient location for many students, the Pinckney property's distance from the Church is relevant.  In addition, the Pinckney property is 11.1 miles from what the Township pinpoints as the geographic center of Livingston County, whereas the Church is 9.9 miles from that geographic center.  We may take judicial notice of maps showing the distances between these locations.  *See Carpenter v. Norfolk & W. Ry. Co.*, 145 F.3d 1330 (Table), 1998 WL 199723, at *4 (6th Cir. 1998) (explaining that the trial court can "take judicial notice of general time/distance

calculations"); Fed. R. Evid. 201, Advisory Comm. Notes (f) (noting that judicial notice "may be taken at any stage of the proceedings, whether in the trial court or on appeal"). Treating the center of Livingston County as the area from which LCS hopes to attract more students, locating its school at the Pinckney property instead of the Church property would increase travel distance by a mere 1.2 miles.

And even if the proper distance to consider is the distance between the Church and the Pinckney property, the additional travel distance is only 12.1 miles. Requiring students to travel an additional 12.1 miles is somewhat of a burden, but we conclude as a matter of law that this is not so significant as to "impose[] a substantial burden on the religious exercise of [LCS]." *See* RLUIPA, 42 U.S.C. § 2000cc. As discussed above, the Eleventh Circuit has held that walking an additional several blocks would not impose a substantial burden on religious adherents whose beliefs bar motor-vehicle travel on the Sabbath. *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227–28 (11th Cir. 2004). The *Midrash Sephardi* court even took into account the mobility difficulties that some members of the synagogue might have and the fact that walking in the Florida summer heat might pose additional problems—but not enough to impose a substantial burden. *Id.*

Likewise, families with especially tight budgets or busy schedules might find burdensome the additional expenses and time constraints of approximately 12.1 more miles of car travel each way, but this does not mean that such additional expense and time is so great as to constitute a substantial burden on LCS's religious mission. This is more analogous to a "mere inconvenience" that would not be deemed a substantial burden under *Living Water*. *See* 258 F. App'x 729, 739 (6th Cir. 2007).

We also note that LCS has not alleged that any functions of its religious school were unable to be carried out on the Pinckney property. LCS focuses on increasing enrollment and raising revenue, but has not identified any religious activity—or even any traditionally secular one—that could not be performed at the Pinckney property. The present case is therefore distinguishable from *Bethel* and *Westchester Day School*, both of which are discussed in more detail above. Even though the expansion in *Westchester* was designed to serve an existing school population that, like LCS, was not growing, the school in *Westchester* established that the

renovations would serve a religious-education mission that could not be performed using its existing space. *See Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.2d 338, 345–46 (2d Cir. 2007) (explaining how the school's philosophy tied Orthodox Jewish teachings into each and every aspect of the school curriculum, and how the expansion would further this mission). There is no such evidence in the present case.

Finally, we note that no credence should be given to any argument that LCS faces a substantial burden because LOTWA now occupies the Pinckney property, thus preventing LCS from returning there. Any such argument would have no merit because LCS leased the Pinckney property to LOTWA only after the special-use permit application by the Church was denied and after this litigation commenced. The fact that LCS cannot now use the Pinckney property due to the seven-year lease is therefore due to LCS's own actions. As discussed above, a burden is not substantial when the plaintiff imposes that burden upon itself. *See, e.g.*, *Andon, LLC v. City of Newport News*, 813 F.3d 510, 515 (4th Cir. 2016); *Petra Presbyterian Church v. Vill. of Northbrook*, 489 F.3d 846, 851 (7th Cir. 2007).

**E.    As a matter of law, LCS was not substantially burdened even if we assume that LCS could establish that no alternative properties were available within Genoa Township.**

LCS alternatively argues that it is substantially burdened because there are allegedly no alternative facilities within Genoa Township where LCS can operate its school. If LCS were correct that a substantial burden results whenever a religious institution cannot find a suitable location within a particular local jurisdiction, then LCS's present inability to use the Pinckney property and its concern about the long-term use of the Whitmore Lake property would be irrelevant because both of those properties are located outside the Township.

We will assume, solely for the purpose of resolving this issue, that there are no alternative facilities available to LCS within the Township's borders. Nevertheless, we conclude as a matter of law that LCS is not substantially burdened by the absence of such other properties because LCS has the Pinckney property as an adequate alternative.

LCS cites *Islamic Center of Mississippi, Inc. v. City of Starkville*, 840 F.2d 293, 300 (5th Cir. 1988), for its argument that being unable to locate anywhere within the Township is itself a

substantial burden.  But that case involved a free-exercise challenge to a zoning ordinance that prohibited all churches within the city limits unless an exception was obtained.  Under the zoning ordinance, the city had allowed exceptions to 25 Christian churches, but denied an exception to an Islamic Center.  The court stated that "the availability of other sites outside city limits does not permit a city to forbid the exercise of a constitutionally protected right within its limits." *Id.* at 300 (citing *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 76–77 (1981) (holding that a local government could not constitutionally ban all live entertainment from its borders by relying on the argument that live entertainment was available in neighboring jurisdictions)).  In so ruling, the court focused on the extensive evidence of religious discrimination against the Islamic Center and the fact that the city's denial of the exception was not narrowly tailored to an important governmental interest. *Id.* at 300–03.

The language that LCS relies on in *Islamic Center* and *Schad* is from a different context than the present case—a First Amendment challenge to laws that categorically prohibited religious assemblies or certain types of speech within a jurisdiction's borders.  In the present case, unlike in *Islamic Center*, there is no evidence that the Township's zoning ordinance has completely banned religiously oriented schools from its borders (or banned them unless they can obtain zoning exceptions).

And even if the Township's denial of the special-use permit has effectively barred LCS from the Township's borders, such a consequence does not automatically establish a RLUIPA violation.  Our research has revealed only a few circuit cases that address this issue in the RLUIPA context.  And most such cases involve challenges to land-use regulations that prohibit plaintiffs from using land in a certain area of a jurisdiction, not in the entire jurisdiction.

The most analogous case is *Andon, LLC v. City of Newport News*, 813 F.3d 510, 515–16 (4th Cir. 2016), in which the Fourth Circuit concluded that there was no substantial burden even though the plaintiff could not find another suitable location within the particular jurisdiction in question.  *Andon*'s holding relied primarily on the fact that the plaintiff's burden was self-imposed, as discussed above.  But the Fourth Circuit also stated that the unavailability of other land in the particular jurisdiction "will not by itself support a substantial burden claim." *Id.* at 516.

Similarly, the Seventh Circuit has held that a land-use regulation does not impose a substantial burden simply because of a "lack of affordable land" in Chicago or for other reasons "incidental to any high-density urban land use." *Civil Liberties for Urban Believers (CLUB) v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003). *CLUB*, however, involved a substantial-burden challenge to a zoning ordinance on its face, not a challenge to a specific land-use decision. *Id.* at 755–56, 763. And the court noted that the plaintiffs had in fact been able to locate in other parts of Chicago. *Id.* at 761.

Because RLUIPA has been held to allow the courts to consider the reasonableness of a plaintiff's expectations in being able to use the land in question for religious purposes, the courts should also be allowed to consider other factors relevant to the substantial-burden inquiry—such as whether the plaintiff had easy access to properties in a neighboring jurisdiction (as LCS had at the Pinckney property). Allowing a plaintiff to make out a substantial-burden claim where the plaintiff has burdened itself or in fact has easy access to suitable property in a neighboring jurisdiction is beyond the protection of RLUIPA. And as the Seventh Circuit has explained, the unavailability of land within a particular jurisdiction can result from the reality of competitive real-estate markets, not the municipality's actions. *See CLUB*, 342 F.3d at 762.

The circumstances of the present case indicate that LCS was not substantially burdened within the meaning of RLUIPA despite the alleged unavailability of other land within Genoa Township. LCS had the Pinckney property as a ready alternative, to which LCS could have returned with little or no expense if it had not leased that property to LOTWA after this litigation commenced. And LCS's stated mission is to serve Livingston County as a whole, not Genoa Township in particular.

Genoa Township is relatively small—it has a total area of 36.3 square miles out of Livingston County's total 565.25 square miles. *See Genoa Township Profile*, Genoa Township, https://genoa.org/community/profile (last visited May 31, 2017); *QuickFacts, Livingston County, Michigan*, U.S. Census Bureau, https://www.census.gov/quickfacts/table/PST045216/26093 (last visited May 31, 2017). The Township is located between Brighton and Howell—two "areas" that LCS has stated would suffice for its school, but that are located at least in part outside of Genoa Township. *See Municipalities*, Livingston County, Michigan,

https://www.livgov.com/Pages/Municipalities.aspx (last visited May 31, 2017).  We take judicial notice of the geographic map of Livingston County and the corresponding square-mileage calculations.

Moreover, the boundaries of jurisdictions on the local-government level are often arbitrary in practice.  Holding that a religious institution is substantially burdened any time that it cannot locate within such a small area—even if it could locate just across the border of the town limits—would be tantamount to giving religious institutions a free pass from zoning laws.  *See Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x at 729, 736–37 (6th Cir. 2007) (explaining that RLUIPA cannot be construed so as to give religious institutions immunity from zoning laws); *see also, e.g.*, *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 96 (1st Cir. 2013) (noting that RLUIPA "does not provide religious institutions with immunity from land use regulation") (quoting 146 Cong. Rec. S7776 (daily ed. July 27, 2000) (joint statement of Sens. Hatch and Kennedy)).  In sum, RLUIPA does not automatically require every minor municipality to have at least one religious school within its borders.

We therefore conclude that the proper inquiry should be more functional and factually driven.  When a religious institution has an available alternative outside of a desired jurisdiction, and where the distance from the desired location to the alternative property is reasonably close, the artificial boundaries of a particular jurisdiction become less important.  The record here does not indicate that traveling the roughly dozen miles to Pinckney would be unduly burdensome to LCS's students.  Nor does the record demonstrate that LCS's religious beliefs required it to locate within Genoa Township specifically.  LCS instead seeks to serve Livingston County as a whole.  Under these circumstances, we hold as a matter of law that LCS was not substantially burdened simply because it could not relocate within Genoa Township.

Our decision should not be taken to mean that a religious institution can never establish a RLUIPA claim based on the inability to locate within a particular jurisdiction.  We simply hold that the determination of whether a substantial burden exists due to geographical limitations is factual in nature.  A religious institution, for example, might have a mission of catering specifically to lower-income individuals located in an urban center, which might be thwarted by relocating to a suburb that lacked public transportation.  *See Islamic Center of Miss., Inc. v. City*

*of Starkville*, 840 F.2d 293, 299 (5th Cir. 1988) (noting that members of a mosque, many of whom were students living in an urban area located near a university campus, would be substantially burdened if they had to travel to the mosque using an automobile).  But the circumstances in the present case simply do not constitute a substantial burden on LCS.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.