NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0448n.06

Case No. 24-5538

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

Oct 02, 2025

KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| BE THE BUSH RECOVERY MINISTRIES, | ) | |
| Plaintiff-Appellant, | ) | |
|  | ) | |
|  | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
|  | ) | THE EASTERN DISTRICT OF |
| COFFEE COUNTY, TENNESSEE, | ) | TENNESSEE |
| Defendant-Appellee. | ) | |
|  | ) | OPINION |

Before: READLER, MURPHY, and MATHIS, Circuit Judges.

READLER, Circuit Judge. Be the Bush Recovery Ministries ("BTB") ran a faith-based residential rehabilitation program for recovering addicts in Coffee County, Tennessee. Seeking to expand, BTB agreed to purchase a former elementary school, now a large home, in the County. But the property was subject to zoning restrictions prohibiting the operation of a recovery facility. Failing to persuade the County to change those rules, BTB sued, alleging violations of a host of federal statutes as well as the Fourteenth Amendment. Between summary judgment and trial, the County prevailed on all claims, prompting BTB's appeal. We now affirm.

I.

A. BTB is a Christian, Tennessee-based nonprofit. It has operated a residential rehabilitation program since 2018. Program participants are held to a rigorous schedule of daily prayer, work, and Christian education, for a 12-to-18-month period.

BTB initially operated out of three rented residential facilities in the County, with a cumulative capacity of 18 beds. While the facilities were large enough to accommodate BTB's students, that arrangement presented some challenges for BTB. For one, the facilities were located near liquor stores as well as gas stations that sell beer and tobacco, which had the potential to "create[] problems" for BTB's resident participants. Prelim. Inj. Hr'g Tr., R. 39, PageID 503. Operating in separate facilities also made it harder for the residents to participate in daily activities together. Nonetheless, BTB, during its over three-year period utilizing these properties, achieved a 95% non-recidivism rate for its graduates, with no resident failing a drug test during that period.

Seeking to house its program under one roof and expand operations, BTB took interest in purchasing a building on an eight-acre property in the County near Riley Creek. The Riley Creek Property was most recently used as a private home but had previously served as an elementary school. The property's large size would have enabled BTB to house up to thirty participants under one roof. Accordingly, BTB agreed to purchase the property—contingent on the County giving zoning approval for using the property as a rehabilitation program.

With respect to the County's zoning rules, the Riley Creek Property was located in a zone classified as a "Low Density Residential District," abbreviated to "RS-1." BTB Email to County Commissioners, R. 58-14, PageID 1203. The RS-1 zone is designed to encourage single-family residential neighborhoods, as reflected by the uses allowed in the zone:

2

| **RS-1, Low Density Residential District** | |
|---|---|
| *Uses Permitted [i.e., of right]* | *Uses Permitted as Special Exceptions [i.e., by permission]* |
| Single-family dwellings. | Duplexes[.] |
| Civil defense facilities. | Any business or service . . . of the same general character as the . . . permitted uses . . . . |
| Fire department facilities. | |
| Police department facilities. | Travel trailer parks and campgrounds. |
| Electrical and gas substations. | Civic, social, fraternal, and philanthropic. |
| Educational facilities (parochial and public). | Private (nonprofit) clubs, lodges, meeting halls and recreation centers. |
| Pumping facilities for water/sewer. | Art galleries. |
| | Athletic associations. |
| Rights of Way for transportation. | Libraries. |
| | Museums. |
| Sewage collection lines. | Indoor and outdoor commercial entertainment and sporting events. |
| Water storage tanks and facilities. | Planetariums and aquariums. |
| General agriculture. | Recreation centers and gymnasiums (nonprofit). |
| Churches and Religious facilit[i]es[.] | Swimming pools and beaches. |
| | Yachting clubs (private). |
| | Zoological and botanical gardens (non-commercial). |
| | Major petroleum and natural gas transmission lines and facilities. |
| | Cemeteries, columbarium[]s, and mausoleums. |
| | Electrical and gas substations. |
| | Golf courses. |
| | Radio, telephone, and television towers and transmission facilities. |

Zoning Resolution 2006-39, R. 58-6, PageID 1026–27. The RS-1 ordinance did not permit BTB

to operate its proposed facility as of right, as that zone permits just one residential use as of right:

single-family dwellings. *See id.* at PageID 1026. By special exception from the zoning authority,

another small-scale residential use—a duplex—is allowed. All other residential uses, including multi-family and large-scale residential use, are prohibited.

Upon agreeing to buy the property, BTB approached the County to obtain zoning approval for using the property to house its rehabilitation program. A zoning administrator informed BTB that its program landed outside any permitted or special use exception identified in RS-1 and suggested that BTB instead seek an amendment to the zoning ordinance. Securing an amendment, however, was not a guarantee. Traversing the County's multi-step process for approving proposed zoning amendments would begin with the Regional Planning Commission, which is tasked with "approving plats, reviewing general growth plans and other such matters as may []come before [it]." Zoning Resolution 2006-39, R. 59-1, PageID 1299. Proposed amendments to a zoning resolution are submitted to the Commission for review and, from there, recommendations are made to the full County Commission. The County Commission, following a public hearing, issues final decisions on rezoning and proposed amendments to the zoning ordinance. Those decisions are appealable to the Regional Board of Zoning Appeals.

In line with this process, BTB proposed an amendment to the RS-1 zoning rules to add as a permitted use "[n]on-profit Churches and/or religious ministries, funded solely by private donations, that provide education, skills training, and addiction recovery support to its members who are temporarily housed at the facility." BTB Zoning Amendment Appl., R. 30-1, PageID 274. The Planning Commission gave the proposal a negative recommendation. BTB did not proceed for consideration by the County Commission, instead opting to file a new application. This time around, BTB sought authorization to operate at the Riley Creek Property by special exception in the RS-1 zone, submitting an effectively identical proposal to its previous proposed amendment. The Planning Commission again voted to reject BTB's proposal. The matter was then placed on

4

the County Commission's agenda for consideration. The County Commission, by an 11-7 vote, also rejected the proposal.

Undeterred, BTB asked the County about rezoning the Riley Creek Property to a "High Density Residential District," or "R-2." Authorized R-2 uses include "special personal and group care facilities." Zoning Resolution 2006-39, R. 58-6, PageID 1096–97 (citation modified). That designation captured, for instance, "assisted living facilities for [the] elderly or handicapped," "nursing homes," "family care facilities," "group care facilities," and "day care facilities for elderly persons." *Id.* at PageID 1025, 1096–97 (citation modified). The County Attorney told BTB that its facilities likely did not fit that category and would instead be classified as a "special institutional care facility." County Attorney Email to BTB, R. 58-16, PageID 1213 (citation modified). Such facilities are allowed in the "General Commercial District" or "C-2" and include "facilities that involve forced residency, full time supervision and care for: . . . individuals who are addicted to drugs and/or alcohol." Zoning Resolution 2006-39, R. 58-6, PageID 1096. The County Attorney also informed BTB that while other zoning codes, if amended, might facilitate BTB, current zoning permitted it to operate only in a C-2 zone.

BTB contemplated its next steps. In the end, it forewent another attempt at securing an amendment to the zoning code. Nor did it seek to have the Riley Creek Property rezoned to meet the requirements of R-2. And BTB was unable to locate a property in a C-2 zone because its options consisted only of "abandoned factories[,]" "gas stations[,]" "or multi-million dollar properties with no existing structures on them," none of which "[were] suitable for a residential faith-based recovery ministry." McCall Dep., R. 58-2, PageID 843. Believing it was left with few other options, BTB filed suit against the County. Included in BTB's complaint were claims under the Fair Housing Act as Amended ("FHAA"), Americans with Disabilities Act ("ADA"),

Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and 42 U.S.C. § 1983, alleging a violation of the Equal Protection Clause of the Fourteenth Amendment.

As the litigation unfolded, another party bought the Riley Creek Property. As for BTB, its lease on its existing properties was set to expire. To ensure it could continue operations, BTB purchased a new plot, one sitting less than four miles away from the Riley Creek Property in neighboring Bedford County. The Bedford Property, also a former elementary school, could host about twenty program participants. Despite relocating, BTB purportedly maintained a desire to return to the County, the place where it was founded, many of its donors reside, and most of its extracurricular activities occur.

B. After filing its complaint, BTB moved for a preliminary injunction. The district court denied BTB's motion, a decision we affirmed. *Be the Bush Recovery Ministries v. Coffee County*, No. 22-5391, 2023 WL 110775, at *2 (6th Cir. Jan. 5, 2023). Both parties then moved for summary judgment. The district court granted summary judgment to the County on all but one claim. As to that remaining claim—BTB's assertion that the County failed to grant BTB a reasonable accommodation in violation of both the FHAA and ADA—the district court concluded that there were genuine issues of material fact necessary for resolution at trial. At the close of the ensuing trial, the jury returned a verdict for the County. BTB now appeals.

II.

Before turning to the merits, a threshold matter bears addressing. BTB timely filed a notice of appeal following the district court's entry of final judgment. *See* Notice of Appeal, R. 127, PageID 2875. But in doing so, it appears to have mistakenly refiled the notice related to its prior appeal from the denial of its preliminary injunction motion, rather than a new notice crafted to later developments in the case. *Compare* Notice of Appeal, R. 127, *with* Notice of Interlocutory

Appeal, R. 35. To that end, the notice filed to initiate this appeal states that BTB is appealing the denial of its motion for a preliminary injunction and makes no mention of the district court's final judgment. Notice of Appeal, R. 127, PageID 2875.

In this instance, it deserves asking whether BTB properly invoked our appellate jurisdiction. Federal Rule of Appellate Procedure 3(c) instructs that a party's notice of appeal must "designate the judgment—or the appealable order—from which the appeal is taken." Fed. R. App. P. 3(c)(1)(B). Historically, Rule 3(c)'s requirements were understood to be jurisdictional in nature, meaning "their satisfaction is a prerequisite to appellate review." *Smith v. Barry*, 502 U.S. 244, 248 (1992). We have likewise taken the position that where a district court order intended to be challenged before us was not properly designated in the notice of appeal, we lacked jurisdiction to review it. *See, e.g.*, *JGR, Inc. v. Thomasville Furniture Indus., Inc.*, 550 F.3d 529, 531 (6th Cir. 2008). So, at first blush, BTB's seeming mistake could deprive us of jurisdiction to hear this entire appeal save for the issues relating to the preliminary injunction order, which we previously resolved.

The Appellate Rules, however, were recently amended. *See generally* Fed. R. App. P. 3, Advisory Committee Notes, 2021 Amendments. Appellate Rule 3(c)(7) now provides that "[a]n appeal must not be dismissed for . . . failure to properly designate the judgment if the notice of appeal was filed after entry of the judgment and designates an order that merged into that judgment." Fed. R. App. P. 3(c)(7). We take this provision to mean what it says. The fact that BTB's notice designated the earlier order denying its motion for a preliminary injunction—and not the final judgment—does not deprive us of jurisdiction over the final judgment. *See also Christian Separatist Church Soc'y of Ohio v. Ohio Dep't of Rehab. & Corr.*, No. 17-4213, 2018 WL 6131852, at *1 (6th Cir. July 12, 2018) (mem.) ("When the district court entered a final

judgment, the interlocutory order denying injunctive relief was merged into the final judgment."). This interpretation, we note, comports with the Second Circuit's similar understanding of the amended appellate rules—namely, that an appeals court retains jurisdiction in this context despite a party's failure to correctly identify the appealed order. *See Brock v. City of New York*, No. 23-1148, 2024 WL 3493495, at *1 (2d Cir. July 22, 2024) (mem.) (applying Rule 3(c)(7) and exercising jurisdiction when notice of appeal designated an earlier order rather than the final judgment); *Killoran v. Westhampton Beach UFSD*, No. 21-2647, 2023 WL 4503151, at *1 n.2 (2d Cir. July 13, 2023) (mem.) (similar). And it also aligns with our recent holding that a notice of appeal does not limit our jurisdiction to the orders designated therein unless an appellant includes express language stating their appeal is so limited. *James v. Norfolk S. Ry. Co.*, No. 24-3275, 2025 WL 2049553, at *6 (6th Cir. July 22, 2025) (interpreting and applying the recently amended Appellate Rule 3(c)(6)).

In light of the rule's recent change, in short, BTB's errant notice of appeal does not limit the scope of its appeal.

### III.

We review a district court's grant of summary judgment with fresh eyes, viewing the evidence and drawing all reasonable inferences in the nonmovant's favor. *Hall v. Navarre*, 118 F.4th 749, 756 (6th Cir. 2024). Summary judgment is warranted only if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(a).

A. *Fair Housing Act as Amended and Americans with Disabilities Act.* Begin with BTB's first claim: that the County's zoning ordinance facially discriminates against the handicapped, in violation of the FHAA and ADA. Both statutes prohibit housing-related discrimination against

8

individuals on the basis of handicap or disability, including against former drug users seeking rehabilitation. 42 U.S.C. § 3604(f)(1) *id.* § 12132; *id.* § 12114(b)(2) (clarifying that handicapped individuals may include former drug users "participating in a supervised rehabilitation program"). And these prohibitions, we have said, apply to municipal zoning laws. *See Smith & Lee Assocs., Inc. v. City of Taylor*, 13 F.3d 920, 924 (6th Cir. 1993) (FHAA applies to zoning); *Anderson v. City of Blue Ash*, 798 F.3d 338, 356 (6th Cir. 2015) (same for ADA). Along the same lines, we have assumed (without deciding) that the same framework applies to claims under each statute. *See Jones v. City of Akron*, No. 19-3286, 2020 U.S. App. LEXIS 35650, at *5 (6th Cir. Nov. 12, 2020) (mem.) (collecting cases).

*Standing.* Before taking up the merits of BTB's claims, we encounter another jurisdictional issue, namely, BTB's standing to pursue each FHAA and ADA claim and each form of relief it seeks. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). For the FHAA and ADA claims, BTB, recall, seeks declaratory relief, monetary damages, and a permanent injunction enjoining the County from enforcing the zoning ordinance. In effect, BTB aims to operate its residential rehab program in the RS-1 and R-2 zones in the County. In district court, the County argued that BTB lacked standing to challenge its exclusion from the R-2 zone. The district court seemingly agreed with the County, addressing BTB's claims related to the RS-1 zone only. BTB claims this was error, asserting that its challenge properly covers both residential zones. Appellant Br. 19–21.

We disagree with BTB. Standing to bring a suit, it is well understood, is an "irreducible constitutional minimum." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To meet this requirement, BTB must satisfy standing's three well known elements. *Id.* at 560–61. That is, BTB must show that it has suffered (or will suffer) an injury in fact that is concrete, particularized, and

actual or imminent; that this injury is caused by the County's conduct; and that this injury will be redressed by a favorable court decision. *Id.*

BTB fails at the outset, as it cannot demonstrate that it suffered an "actual" injury by being excluded from the R-2 zone. *Id.* BTB, remember, sought to purchase a property in the RS-1 zone only. And once it contracted to purchase the Riley Creek Property, it applied for a zoning variance in just the RS-1 zone. BTB has never identified any property that suited its needs in the R-2 zone, nor did BTB seek to have the Riley Creek Property rezoned to satisfy R-2's requirements. As a result, BTB lacks any "past injury" from the R-2 ordinance that might suffice to obtain backward-looking relief in the form of damages. Likewise, no imminent future injury exists to allow the other types of forward-looking equitable remedies BTB seeks. *Bannister v. Knox County Bd. of Educ.*, 49 F.4th 1000, 1017 (6th Cir. 2022).

BTB similarly lacks standing to seek any declaratory or injunctive relief as to either the RS-1 or R-2 zone. While BTB claims that it "wants to return to [the] County," Appellant Br. 15, what we interpret to mean potentially in either an RS-1 or R-2 zone, that bare assertion fails to meet standing's injury requirement to obtain equitable relief to challenge either the County's RS-1 or R-2 zoning rules. *See Bannister*, 49 F.4th at 1017 (requiring an imminent injury to have standing to obtain forward-looking equitable remedies). Consider here the Supreme Court's decision in *Lujan*. The plaintiffs there challenged a regulation that limited the scope of the Endangered Species Act, claiming that U.S.-funded projects abroad threatened endangered species they wished to observe. *Id.* at 557–58. That was not enough to demonstrate standing. *Id.* at 562. Why? Because the plaintiffs' asserted injuries were speculative, and thus lacked the concreteness and imminence required by Article III. *Id.* at 564. As the Supreme Court explained, a professed "intent to return," "without any description of concrete plans, or . . . even any specification

10

of *when* the some day will be—do[es] not support a finding of the actual or imminent injury" needed. *Id.* (citation modified). BTB runs into the same issue here. While it claims it would move back to the County, BTB's purported plan to operate in an RS-1 or R-2 zone is speculative, as it has identified no property in either zone that might house its rehabilitation center. *See* Oral Arg. at 5:10.

BTB counters that it need not engage in a fruitless exercise before obtaining injunctive relief. In its view, it is pointless to attempt to purchase a new site when the County will inevitably deny its zoning variance. Fair enough. But we do not require that BTB contract to buy a new home. We do ask, however, that BTB describe any "concrete plans" it has in the future that will necessitate a zoning variance, *Lujan*, 504 U.S. at 564, such as identifying properties in the RS-1 or R-2 zone that it could acquire in the near future, *cf. Tenn. Conf. of NAACP v. Lee*, 139 F.4th 557, 567 (6th Cir. 2025) (noting there was no imminent injury where the NAACP "did not identify any specific individuals . . . whom it planned to help" but only "suggest[ed] it may help such an individual at some point down the road"). This is what imminence requires. At bottom, because BTB currently has only "some day intentions" to return to the County, it has failed to show that any exclusion from a zone in the County amounts to the "imminent injury" required for it to have standing to obtain equitable relief. *Lujan*, 504 U.S. at 564.

On the other hand, we agree that BTB has standing to pursue damages stemming from its exclusion from the RS-1 zone and the denial of its proposed amendment to that zone. *See Bannister*, 49 F.4th at 1017. As mentioned, BTB attempted to purchase property in an RS-1 zone. And when BTB learned that the County's zoning ordinance did not allow it to operate in an RS-1 zone, BTB sought both a zoning amendment and special use exception from the County. The County's denial of both efforts foreclosed BTB's ability to acquire the property and forced it to

11

relocate to another county. This loss of a definite economic opportunity is a classic example of the kind of injury that satisfies Article III's "actual" injury requirement. *See, e.g.*, *TransUnion*, 141 S. Ct. at 2204 (explaining that "traditional tangible harms, such as physical harms and monetary harms" qualify as an injury in fact under Article III).

*Facial Discrimination.* With our focus on the claims seeking damages for BTB's exclusion from the RS-1 zone, we turn to the merits. Recall that the district court granted summary judgment for the County on BTB's claim that the RS-1 zoning ordinance facially discriminated against the handicapped but denied summary judgment on the question of reasonable accommodation. Because BTB does not challenge the jury's findings on the reasonable accommodation claim, that leaves only the first claim for us to address.

As a general matter, the FHAA and ADA prohibit "facially discriminatory actions," which constitute a form of intentional discrimination or disparate treatment. *Larkin v. Mich. Dep't of Soc. Servs.*, 89 F.3d 285, 289 (6th Cir. 1996); *see also Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 177 (3d Cir. 2005) (discussing facially discriminatory ordinances as a form of intentional discrimination under the FHAA). In the setting of a group home like the one operated by BTB, a statute facially discriminates when it "single[s] out . . . group homes for the handicapped" for different or worse treatment than comparable uses because of their residents' handicap. *Larkin*, 89 F.3d at 290 (citing *Smith & Lee Assocs.*, 13 F.3d at 930); *Cmty. Servs., Inc.*, 421 F.3d at 178 (explaining that "the most fundamental element of [a facial discrimination] claim is that [the] plaintiff must demonstrate that [the] defendant's alleged discrimination was 'because of a handicap'" (quoting 42 U.S.C. § 3604(f)(2))).

Measured by these standards, the County's zoning rules for RS-1 zones do not facially discriminate against the handicapped. Begin with the text of the RS-1 ordinance. RS-1 zones "are

designed to provide suitable areas for residential development consisting of single-family dwellings and other structures that are accessory thereto within areas that are suburban in nature." Zoning Resolution 2006-39, R. 58-6, PageID 1026. In line with that aim, the only "permitted" residential structures are "[s]ingle family dwellings," with duplexes allowed "by special exception." *Id.* at PageID 1026–27. The regulation, notably, contains no mention of the handicapped. Rather, the County employs a neutral distinction between family homes and other residential uses. In that way, the limitation to single family homes and duplexes places BTB's rehab facility in the same position as any other type of non-family residential use. Said differently, BTB's exclusion from the RS-1 zones is not "because of" its residents' handicap.

Nor does the County allow any uses in an RS-1 zone analogous to BTB's intended use. Recall that RS-1 zones permit only "single-family dwellings" as of right, and duplexes by special exception. No other residential uses—whether tied to handicapped persons or not—are allowed. As we have explained before, where "[r]esidential substance abuse service facilities [are] treated the same as many other residential uses," a local ordinance is not facially discriminatory. *Get Back Up, Inc. v. City of Detroit*, 606 F. App'x 792, 796 (6th Cir. 2015) (per curiam). Confirming as much here is the fact that "[t]here is no indication that disabled status, rather than, for example, the building size or the commercial character of the development, is the dispositive trait, singled out for different treatment." *431 E. Palisade Ave. Real Est., LLC v. City of Englewood*, 977 F.3d 277, 287–88 (3d Cir. 2020). In the end, BTB cannot show that its exclusion from the RS-1 zone was "because of" its residents' handicap. *See* 42 U.S.C. § 3604(f)(1).

Seeing things otherwise, BTB responds that the County's zoning rules resemble those we held to be unlawful in *MX Group, Inc. v. City of Covington*, 293 F.3d 326 (6th Cir. 2002), and *Larkin v. Michigan Department of Social Services*, 89 F.3d 285 (6th Cir. 1996). But in those cases,

13

unlike here, handicapped individuals were singled out for adverse treatment. Start with *MX Group*, where a methadone clinic challenged the City of Covington's amendment to its zoning code that limited the number of "addiction treatment facilities" to one facility for every 20,000 persons in the city. *MX Grp.*, 293 F.3d at 330–31. That limitation conspicuously did not apply to any other type of group facility and, in practice "completely foreclosed" the clinic's (or any similar operation's) opening. *Id.* By singling out such facilities for this unique burden, the ordinance facially discriminated against the clinics, and, as we noted, had the effect of imposing a "blanket prohibition" on any new clinic across "the entire city." *Id.* at 345. But the zoning ordinance for RS-1 zones here contains no similar facial discrimination. *Cf. Quality of Life, Corp. v. City of Margate*, 805 F. App'x 762, 769 (11th Cir. 2020) (distinguishing facts of *MX Group* from an ordinance that barred drug-detox facilities in residential zones but allowed them in community-facility zones). Similarly, in *Larkin*, the challenged statute explicitly imposed spacing and notice requirements on foster care facilities only. *Larkin*, 89 F.3d at 289–90. That arrangement, "by [its] very terms," applied only to "facilities which will house the disabled," and "not to other living arrangements." *Id.* at 290. By "singl[ing] out for regulation group homes for the handicapped," the ordinance, we explained, was "facially discriminatory." *Id.* Here, by contrast, the County's RS-1 zoning has not imposed such a wholesale ban or special burden on substance abuse treatment centers. In short, BTB cannot survive summary judgment on its claim that the County's RS-1 zoning rules are facially discriminatory. (Our conclusion necessarily forecloses two of BTB's subsidiary arguments—one, that the district court never evaluated a claim of facial discrimination, and two, that the district court erred in concluding that the County is immune from punitive damages for any facial discrimination.)

14

*Claims Allowed at Trial*.  BTB raises one last challenge to the district court's FHAA and ADA holdings.  Namely, it asserts that it should have been able to pursue two theories at trial: one, that the County "applied its zoning ordinance in a discriminatory manner," and two, that it "failed to make a reasonable accommodation for [BTB] under the FHA[A] and ADA."  The district court allowed just the latter claim to proceed, characterizing the former as an abandoned disparate impact claim.  On appeal, BTB argues that it intended to pursue and adequately preserved a claim regarding as-applied disparate *treatment*—not impact.

Whether we classify the claim as one about disparate treatment or disparate impact makes no difference, as BTB failed to preserve either one.  When it moved for a preliminary injunction, BTB gave just two reasons why it was likely to succeed on the merits of its FHAA and ADA claims:  "The County's zoning resolution is *facially discriminatory*," and the County "has denied Plaintiff a reasonable accommodation."  Pl.'s Mem. Supp. Mot. Prelim. Inj., R. 3-1, PageID 170, 173 (emphasis added).  BTB did the same when appealing the district court's denial of the preliminary injunction.  Even more importantly, the County moved for summary judgment on *all* of BTB's claims.  At this point, BTB needed to show that a genuine issue of material fact existed on all claims that it pursued.  In response, BTB "ask[ed] th[e district] court to (1) declare the County's *facially discriminatory* ordinance illegal . . . and (2) find that the County denied [a] reasonable accommodation."  Pl.'s Resp. Opp'n Def.'s Mot. Summ. J., R. 62, PageID 1494; *see also* Pl.'s Reply Supp. Mot. Summ. J., R. 67, PageID 1616, 1619 (BTB asserting that it was "entitled to judgment on its" FHAA and ADA claims because the resolution is "facially discriminatory" and the County denied it "a reasonable accommodation" (citation modified)).  At no point did BTB assert that it had created a genuine issue of material fact on a distinct as-applied disparate treatment or disparate impact claim.  In sum, by failing to address its purported claim "in

response to a motion for summary judgment," BTB abandoned the claim. *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013).

B.  *Religious Land Use and Institutionalized Persons Act.*  The district court granted summary judgment to the County on BTB's claim that the County violated RLUIPA by denying its request for a zoning variance.  RLUIPA forbids state and local governments from imposing or implementing zoning in a way "that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution" unless the ordinance is the "least restrictive means of furthering [a] compelling governmental interest."  42 U.S.C. § 2000cc(a)(1).  At issue here is whether BTB could show that the County's zoning ordinance imposes a substantial burden on BTB's religious exercise.

BTB claims "that the Riley Creek Property provided an ideal home for BTB's ministry," large enough to house the program in one location and situated in an ideal residential environment. Appellant Br. 31.  But by denying BTB's proposed amendment to the RS-1 zoning ordinance, in BTB's telling, the County made it nearly impossible for BTB to find a suitable and affordable alternative, forcing BTB to relocate to a neighboring county and buy a less ideal property, thereby imposing an impermissible substantial burden on its religious exercise.

As RLUIPA's text suggests, not all burdens qualify as "substantial."  *See Living Water Church of God v. Charter Township of Meridian*, 258 F. App'x 729, 736–37 (6th Cir. 2007) (noting that the term cannot be read out of the statute).  In addressing what burdens cross that threshold, we have avoided setting a "bright line test" for what amounts to a substantial burden. *Livingston Christian Schs. v. Genoa Charter Township*, 858 F.3d 996, 1002 (6th Cir. 2017); *Living Water*, 258 F. App'x at 737.  Instead, we have considered various factors in making that assessment, including whether (1) the burden is more than a "mere inconvenience," *Living Water*, 258 F. App'x

16

at 739, (2) the organization has been prevented from carrying out its "core religious functions," *Livingston*, 858 F.3d at 1006, (3) there is a suitable and readily available alternative property, *id.*, and (4) the organization suffered from a substantial delay, uncertainty, or expense in waiting for a zoning variance, *id.*

Applying those factors here, BTB fails to show a substantial burden at summary judgment. Start with BTB's stated desire to expand and consolidate its resident housing. While a facility's inability to expand may amount to a substantial burden, such claims require proof that the current facility is so inadequate as to substantially burden the plaintiff's ministry. *See, e.g.*, *Westchester Day Sch. v. Village of Mamaroneck*, 504 F.3d 338, 352–53 (2d Cir. 2007). BTB offers no such evidence. In fact, it concedes it was not at capacity. *See* Prelim. Inj. Hr'g Tr., R. 39, PageID 530. And while it speculates that capacity issues could arise in the future, we evaluate substantial burdens based on present circumstances—not hypothetical future ones. *Living Water*, 258 F. App'x at 738.

As for BTB's desire to be in a single home to aid scheduling and transportation, here too BTB cannot show that the County's zoning restrictions amount to a substantial burden on BTB's exercise of religion. BTB's claim mirrors one rejected in *Living Water*. There, a Christian school argued that it needed to build a gymnasium onsite to avoid transporting students elsewhere for physical education. *Id.* at 738. The panel acknowledged "that it would be more convenient to have [a gym] onsite" as the school otherwise had to take students offsite for recreation. *Id.* at 739. But the panel deemed this only a "mere inconvenience," as the school could still carry out its religious mission. *Id.* So too here. While BTB would prefer to operate from a single site, nothing in the record suggests that its previous multi-property setup impaired its ability to carry out its core religious mission.

17

Finally, consider BTB's claim that it needs to be in a residential district. According to BTB, numerous studies confirm that "recovery centers thrive in rural or residential areas." Appellant Br. 33; *see also* McCall Dep., R. 58-2, PageID 876. That said, BTB offers no specific proof that an inability to relocate to such a site in the County substantially harmed its ministry. *See Livingston*, 858 F.3d at 1007–08 (explaining that no substantial burden existed where a religious school complained of dwindling enrollment but failed to provide evidence that was caused by a failure to relocate). Nothing in the record shows that BTB had to curtail its ministry as a result of not being located in a residential district. To the contrary, the record reveals that BTB achieved an extraordinary success rate of 95% and went 3.5 years without a student failing a drug test. Prelim. Inj. Hr'g Tr., R. 39, PageID 517, 546. While the inability to conduct operations in a more conducive environment is fairly understood as a burden, the evidence does not reveal a substantial burden. Instead, the level of success BTB is currently experiencing indicates that it is more a "mere inconvenience" on its religion-infused efforts. *Livingston*, 858 F.3d at 1003 (quoting *Living Water*, 258 F. App'x at 739).

Seeing things otherwise, BTB counters that its case is unique because it was essentially "forced to relocate" outside the County. Appellant Br. 12 (emphasis omitted). On this point, BTB alleges in particular that (1) it was relegated to one of the smallest and most expensive zone of the County; (2) it would be forced to have a residential treatment center in a commercial area near liquor stores and bars, undermining its mission; and (3) the process caused substantial delay, uncertainty, and expense. For both legal and factual reasons, these arguments do not move the ball.

Begin with BTB's relocation argument. An effectively identical argument was rejected in *Livingston*. There, we held that a religious institution's inability to locate suitable facilities within

a town's borders did not constitute a substantial burden on the institution's exercise of religion. *Livingston*, 858 F.3d at 1011. Critical to our analysis was the presence of an alternative facility just outside of town, *id.*, much like the Bedford County Property here, which sits only a four-mile drive away from the Riley Creek Property, Google Maps Directions, R. 59-10, PageID 1449. And, like the plaintiff in *Livingston*, BTB's reasons for wanting to return to the County seem unrelated to its religious mission. *Compare Livingston*, 858 F.3d at 1011–12 (observing the school's religious mission was not directly tied to location in one township), *with* Bell Decl., R. 62-1, PageID 1515–16 (citing community ties and donor proximity as BTB's reasons for wanting to return). Instead, that desire appears to be driven more by preference than a religious need.

Nor does BTB's argument about the character and cost of the C-2 zone carry the day. As discussed, that the County's zoning ordinances require BTB to operate in C-2's commercial zone rather than a residential one does not amount to a substantial burden. Again, there is no evidence that BTB's ministry was substantially burdened when it initially rented in a residential location within the city. Rather, the record seems to reflect that BTB's work was unimpeded there. And while C-2 may be the smallest and most expensive zone, cost alone is not enough to establish a substantial burden when, as here, the desired location relates to preference rather than religious need. *See Love Church v. City of Evanston*, 896 F.2d 1082, 1086 (7th Cir. 1990) ("[W]hatever specific difficulties [plaintiff] claims to have encountered, they are the same ones that face all [land users]. The harsh reality of the marketplace sometimes dictates that certain facilities are not available to those who desire them.").

Lastly, BTB suggests that the County's zoning amendment process imposed impermissible delay and cost on BTB. On this point, BTB invokes *Catholic Healthcare International, Inc. v. Genoa Charter Township*, 82 F.4th 442 (6th Cir. 2023), where we found a substantial burden on

religious exercise because the plaintiffs, due to lengthy administrative zoning proceedings, were "unable to place the[ir] religious displays on their prayer trail" for two years. *Id.* at 449. BTB, on the other hand, continued with its successful ministry, was never forced to suspend operations, and was able to locate an alternative location. *See also Living Water*, 258 F. App'x at 739 (no substantial burden when church needed to reapply for a permit and spend time and money to redraw plans but was still able to carry out its religious mission).

We do not doubt that, as BTB emphasizes, it would have been easier to run its program in a residential area in the County. But without more, this inconvenience falls short of meeting RLUIPA's requirement.

C. *Equal Protection*. Finally, BTB claims that the County violated the Fourteenth Amendment's Equal Protection Clause by treating BTB's proposed property use differently than similarly situated RS-1 uses. The Equal Protection Clause prohibits "any State" from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend XIV, § 1. This well-trodden language safeguards against government action that "burdens a fundamental right, targets a suspect class, or has no rational basis." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (citation modified). Here, BTB pursues a "class of one" theory, which requires it to show that (1) the County treated it differently than similarly situated peers, and (2) there was no rational basis for the different treatment. *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601–02 (2008).

BTB's claim stumbles on both prongs. As to the first, BTB must identify similarly situated comparators that the County intentionally treated different. *Green Genie, Inc. v. City of Detroit*, 63 F.4th 521, 527 (6th Cir. 2023). On this front, BTB does not identify a comparator group home that sought either a zoning amendment or special exception to operate in the RS-1 zone. Rather,

20

BTB alleges that it is being treated differently from similar generally permitted (or allowed by special exception) RS-1 uses such as lodges, camps, and duplexes. Assuming these general categories can serve as comparators, *but see id.* at 528 (considering as comparators those with "relevant similarity," meaning the same type of facility that went through the same zoning process), BTB is not "similarly situated." Unlike a lodge or camp, which caters to short term visitors, BTB's participants must commit to at least a year-long residential program. Nor does BTB simply provide small housing like a duplex. Instead, BTB serves as a treatment facility for nearly 20 patients. These stark differences mean the various groups "are dissimilar in some material respect." *Green Genie*, 63 F.4th at 529 (citation modified). And even if BTB could get past prong one, BTB would still need to show that the County's action either lacks any rational basis that might support its decision or was motivated by animus or ill will. *Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005). BTB cannot do so. It is not difficult to see a rational basis underlying the County's RS-1 zoning classifications, in that they seemingly are tied to promoting public health and safety, as well as enhancing its residential areas. And, as already discussed, the ordinance is facially neutral and lacks any indication of improper animus. Accordingly, BTB's equal protection claim fails.

*     *     *     *     *

For the reasons just explained, we affirm the district court.